Good morning and may it please the court. Opposing counsel, my name is Jonathan Brown. It is and it is an honor to be before this court representing Ms. McNeil today. I would like to reserve five minutes of my time for rebuttal. This is a case that boils down to the facts and whether a jury should be allowed to weigh those facts and the evidence and have an opportunity to apply it to the law. There are several facts at issue in this case but what is not disputed is the fact that Mrs. McNeil suffered through a particularly horrendous sequence of events in a time in her life when several major events coalesced at once. The issues that I'd like to discuss today are whether certain job functions are essential versus marginal. I would like the court, according to Rears, to keep in mind that the employer bears the burden of showing that a particular function is an essential function and we not only by the regulations but by multiple cases including Scruggs, Fadley, Cowitz, that when determining whether a job function is essential, we look at several different factors. What functions the employer thinks are essential, which I don't think is in dispute, Union Pacific is going to argue that mandatory overtime is an essential function. Do you dispute that? Do we dispute whether it is an essential function? Absolutely. And Judge Malloy, I would point to a question that you asked earlier this morning and looking at whether or not other employees have been given opportunities, and I think you use the example of 15%, whether or not we can look at that and determine if other employees are given reasonable accommodations to that extent, whether or not that goes to the question of essential function. And I believe Mr. Moore on behalf of Union Pacific was correct in that it does. It is a fact that can be considered, and a fact I believe a jury in this case will consider, and that goes to the consequences of not having an employee perform the function, which is another one of those tests, and whether other current employees in similar jobs perform the function. I thought the railroad's position in this case was that overtime is an essential function. We can accommodate a person who says I can only serve occasional overtime because there's at least three other people I believe who would be comparable to that situation, but we cannot accommodate a permanent prohibition on overtime. That's exactly correct, and whether or not this is a permanent restriction is a genuine issue of material fact, and I believe the District Court referenced that in their order granting UP summary judgments, that there is a disagreement of fact on that issue of whether it's temporary versus permanent. Your Honor, you mentioned the three comparators, and I would like to take some time to discuss those because this case, Your Honor, in all employment cases are very fact intensive. The first comparator, Dennis McCabe, has a permanent restriction. There's no disagreement of fact it's permanent. The restriction is that he's restricted to 10 hours of work. The normal day is 8.25 hours, and that's an additional two hours. However, looking at the reality of why this CCD, this critical call dispatch position required overtime, is to have somebody who's scheduled on a red day be able to stay four hours past their shift to account for somebody who isn't going to show up for the next shift. A 10-hour restriction, Your Honor, per se restricts the ability to do just that. He can't stay the full four hours. In fact, in Appley's brief, they went through and itemized every time that Mr. McCabe worked overtime. He was granted his restriction in March of 2011. How many times did you work overtime in 2011? Zero. How many times did you work overtime in 2012? Zero. How many times did you work overtime in 2013? Six, it's the most. 14 and 15, one time each, and we don't know from the record whether that was five minutes of overtime. It had to be less than two hours of overtime, but we don't know. But that goes to those questions. Those are facts that a jury should be able to weigh and say, hey, the fact is mandatory overtime an essential function of here? Looking at how many times the comparators actually worked this mandatory overtime. In fact, if you take, for example, 2013 in which Mr. McCabe worked six times, I went to law school, your honors, and I'm not particularly great at law, but I'm less great at math. But if we just do a little quick math, assuming that he worked 50 weeks a year, granted him two weeks of vacation, and taking the year in which he worked six occasions of overtime, that's only 2.4% of the year when he even had to work overtime. And again, he went two years without having to work any. I think that's a fact that a jury should take into account and weigh as to whether this is an essential function, something the district court did not do. They simply said, this is an essential function of the job. They've compared this case to the Turnagel case and used that . . . they relied on that heavily, in her opinion. And this case is vastly different from the Turnagel case. In the Turnagel case, there were 22 Saturdays in 2005 that were overtime. Here, again, we have six. Two years worked one and two years worked zero. There was a permanent restriction in Turnagel. Again, this is a summary judgment. The court must view the evidence in light most favorable to the non-moving party. There's a disagreement of fact as to whether this is a permanent restriction. Therefore, our restriction is temporary for the purposes of summary judgment. Also, all other employees in Turnagel had to work overtime. Looking at Darcy Brinson, who's another comparator, the FLE laid out in their brief how many times Darcy Brinson worked overtime. Again, she was given her permanent day shift restriction in January of 2012. Again, in January in 2012, the entirety of the year worked not one minute of overtime, no overtime. 2013, no overtime. Again, 2014 and 2015, she worked six and five. Again, that's granted the scope of how many times an employee works. I think that is a factor and specifically factor number three and how much time an employee spends on the job performing the function. Again, Justin Larson is another comparator whose restriction was he could work an occasional 12-hour shift. Again, I'm really not sure what that 12-hour shift, if this is a mandatory essential function, what would stop Mr. Larson from saying I worked in overtime last week, I'm not doing it again. That would weigh against this being an essential function of the job and also go to the consequences of not having the employee perform their function. There were multiple redundancies that the CCD put in place to account for the fact whether or not somebody could work their red day, the day that they were scheduled to work their mandatory overtime. In fact, there's also a disagreement of fact as to whether the employees were scheduled for one or two days, which is a big difference, whether or not an employee is scheduled to work mandatory overtime once or twice per week. In the case of Darcy Brinson, the permanent day shift restriction with a third overtime, again I'm not really sure how the third overtime gets applied, but as I Mrs. McNeil. How is the company supposed to know when the need for overtime will arise? The company will not know when the need for overtime arises. I think what UP is going to argue that the availability is the essential function, the availability to be present for overtime. But again, looking back at Mr. McCabe, how is the company going to know that they need four hours of overtime? So if the person following Mr. McCabe doesn't show up for their shift and he is scheduled for a red day, it's his responsibility to stay for that four hours. Now the company is in a position where they have somebody who can stay two hours and what does the company do? They go to the next one down the line. They go to a blue day and the tan day. In this case, this is a permanent restriction for Mr. McCabe and Mrs. McNeil is only alleging that her restriction was in place from September, when it was issued by her doctor, to January. That's not what the doctor said, though. That's another one of the problems. That is one of the problems, Judge Mulley. Thank you for asking about that because what I want to point you to is that goes further down the line to if the court decides it is an essential function and then we're asking whether or not she can perform that essential function with or without reasonable accommodation and whether or not UP engaged in the interactive process. And I would direct your Honor's attention to the portions of the joint Darcy Brinson's restriction. Her restriction, she was initially given a restriction of daytime. What happens after that and the portions of the record, Your Honor, is joint appendix pages 1269, 1271, 1272, 1282, 1285. If you look through those, what you see is a letter from Miss Brinson's doctor saying daytime only. Then you have a letter on UP letterhead going back to the doctor or to the disability team asking for more clarification. What does that mean? Does that mean she can work overtime? Does it mean not overtime? And the doctor then responds and clarifies it. In this case, we have a letter from a doctor saying no overtime. It doesn't say no overtime for any specific permanently and it also doesn't say only until January. But what UP didn't do is compare her, Darcy Brinson, and go back and say give me some clarification on that. What would need to be clarified about Dr. Sharma's letter? I think whether or not it's a permanent restriction. And also, Your Honor, again if you look at Darcy Brinson's initial restriction that was placed in January of 2012, it says daytime only. And then throughout the interactive process, the overtime gets defined as one-third overtime. So it changes based on UP's inquiry. And I think, Your Honor, that is a fact that a jury should hear to determine whether or not that this is a an essential function and whether or not UP engaged in the interactive process. I would like to reserve the rest of my time for rebuttal. You may. Thank you. Ms. Baylis, we'll hear from you. Thank you. Thank you, Your Honor. May it please the court, opposing counsel, my name is Allison Baylis and I represent the Apelli Union Pacific Railroad Company. The linchpin in Ms. McNeil's discrimination claims is the question of whether or not the ability to be to work overtime, the availability for overtime, not just overtime itself, but the availability of overtime is an essential function of her critical call dispatcher job or the CCD job. And once the district court correctly made that determination, both her race discrimination claims and her disability discriminations fail. So it's important to properly analyze, as the district court did, why CCDs were required to work or to be available to work overtime. So CCDs like Ms. McNeil work in the response management call center, communication center, or the RMCC. It's a 24-7 continuous operation that is very similar to a 9-1-1 call center. And the CCDs are the 9-1-1 call operators. They are receiving what are called critical, or calls about critical incidents. So these are about fires, they're about derailments, they're about injuries on the track, they're about fatalities sometimes on the track. And the job description, which is it, the appendix 79 says that the primary function of this position is to respond timely and with a sense of urgency to incoming phone calls related to critical incidents on or near railroad property to ensure employee and public safety. So they have a very important job in handling these phone calls. And therefore it's critical to have sufficient staffing in the RMCC, which is reflected in their scheduling and attendance policies. So for this reason, the CCDs can't just leave their desk at the end of their 8-hour and 15-minute shift. They have to wait until they're replaced by the next CCD. And only one CCD is allowed to leave the room at a time during the shift. And if a CCD calls in sick or is running late, the RMCC does not just leave it to chance that there will be somebody to replace or to stay in that seat. That's why they have the system of red days and blue days. A CCD knows that if they, today is their red day, they could be called in up to, not necessarily the full four hours, but up to four hours early. Or they may be asked to stay up to four hours late. And then if they're on their blue day, they're next on deck in case they already used all the people on their red day. So in addition, CCDs can't just end their shift in the middle of a critical call. One of the requirements is that they stay sometimes 30 to 45 minutes past the end of the shift if they're on one of those critical calls. Because they can't just hand it off to the next person. There's continuity there that's required to make sure that this critical call is handled appropriately. And all of this was most important during the day shift. The shift that Ms. McNeil's doctor said she had to be on. That's the shift that had the most emergency calls come in and therefore required the greatest amount of overtime. So it was with this background that the district court made, analyzed the factors and the regulation and determined that the ability to work overtime is an essential function of this position. So first, the job description. We already talked about the scheduling requirements that said mandated overtime is a requirement. And it's not the specific words that are used in the job description, but how the job is required. So for example, in the Alexander versus Northland Inn case, vacuuming wasn't even mentioned in the job description. So here the specific job description doesn't mention overtime while the scheduling policies do. But in Alexander, the court said the job description said you have to be able to perform all of the functions as needed and every supervisor had testified that that included vacuuming. So the court relied on that and saying the job description showed that vacuuming was an essential function. The employer's judgment, obviously Judge Malloy, as you wrote in the case of the supervisors, the employer's judgment is highly probative in the question of whether something is an essential function. In their briefing, Ms. McNeil relies on Hostetler versus College of Worcester, which is a case out of the Sixth Circuit, but her reliance on this is misplaced. In that case, the courts of the defendant failed to explain why full-time work was essential. The court said full-time presence is not an essential function on the job description. It's tied to some other job requirement. And in this case, Union Pacific has shown why overtime, the ability to work overtime, is necessary in the RMCC. What about this comparator that was cited who supposedly could only work two hours of overtime? Absolutely. So... Why is he qualified if he's not available for four hours before and after his shift on a red day? Because what Mr. Brian Jarrett, who ran the RMCC, what he testified to is the fact that he could stay almost two hours past the end of his shift gave the RMCC the flexibility it needed so that if somebody called in late, so say you get a call five minutes before the next shift is start and that CCD who's supposed to replace Mr. McCabe says, I'm stuck in traffic, I'm not gonna make it on time. Mr. McCabe isn't just gonna say, I'm sorry, I can only be here for the eight hours and 15 minutes of my shift, and he walks off the job. That's what Ms. McNeil's doctor said her restriction was. It was no overtime. And therefore, her restriction was different from Mr. McCabe's. If she had gotten the doctor to say the same thing that I think was MetLife said, which is it was only gonna last for four months, and it wasn't even four months because she wasn't coming back to work until probably October at maybe three months. Would Union Pacific been able to accommodate that? No, your honor, because first of all, the ability to work over time is an essential function. Though they said they were willing to do it earlier? Well, they said they could do it for eight weeks, and they said eight weeks. If you look at the email correspondence in that situation, they said her return to work date was like June 24th, and they said they could accommodate it through a certain date in August. So it was a total of eight weeks. But regardless, in the Reams versus Imes case, the court said that we're not gonna punish an employer by being willing to go above and beyond what the ADA offers in temporarily accommodating an employee in an essential function of a job. So we're not gonna turn something the employer hasn't conceded that a essential function is non-essential just by giving a temporary accommodation. And so what is the essential function here in terms of availability? The essential function is being available to work past the end of that 8 hour and 15 minute shift in case they're on... For how long? Well, I think Mr. McCabe being able to work that additional two hours. I mean, the fact that they have to stay on that critical call until that critical call is resolved. That's the essential function, being able to stay on a call that comes at the end of the eight hour shift, and once that call is finished, I think that function is ended? I think that's part of it, and the record showed that that could be up to 30 to 45 minutes. But in addition, the ability to stay at least until you can get another CCD who may be on their red day for the next shift and call them in early to get there because they have to come four hours early. I mean, that ability to cover as opposed to just saying, I'm sorry, it's the end of my shift, I know you need a butt in this seat, but I've got to walk out the door. That's the essential function that McCabe and Larson and Brinson could all perform that Ms. McNeil could not. And so, I'm sorry. Go ahead. No, so my point is Well, I just wonder, you start out saying four hours and then with McCabe it's now only two hours, and I suppose if somebody could only work one hour you might say well that's okay too because the calls typically last 30 to 45 minutes, or maybe you wouldn't say it's okay. I don't know what you would say, but what I'm just trying to understand, it doesn't sound like the four hour before and after is really the essential function. No, I don't think it's you have to be able to stay for four hours, and that's not what the record reflects. I mean, the policies say you have to be available to come on up to four hours early or stay up to four hours late, but what the record shows is it's this flexibility that's really important. And what degree of flexibility? I mean, up to four hours is flexibility. Right, but it has to two hours is not as flexible as up to four hours. True, but it has to be sufficient to be able to get them what they need to be able to get another CCD in that seat. How do we know how long that takes? I mean, suppose somebody can't get there within two hours, then it's not enough time. Well, I think they have sufficient, I mean, you've got more than one person on their red day, that's why they also have blue days. I mean, I think the scheduling that they have come up with, and by the way, Mr. McCabe also worked on the night shift, so there wasn't as much overtime on that shift. There weren't as many critical calls, and so maybe they could get by with 10 hours there, whereas Ms. Brinson and Mr. Larson, they had a 12-hour minimum or restriction. They couldn't work more than 12 hours, so they could fully cover that four-hour period. So the difference between that day shift and the night shift is a few minutes ago, council went over some statistics for McCabe, Brinson, and Larson, and they indicated, if they're accurate, that in fact those comparators actually didn't work much overtime, and with Brinson, even a couple of years with actually working no overtime. How does that play into this? And that's fair. I have two responses to that. The first is, when you're looking at the amount of time, I would argue it's not the amount of overtime, it's the amount of time they were available to work overtime. So once a week, or as the district court noted in its decision, three to four times a month, they were all scheduled for a red day, meaning on that day they were available to work overtime. That's the first point. But the second point is, this is similar to the Drapinski versus Douglas County case, which is a case Judge Malou set on the panel. The employee in this situation argued that things in the job description, so lifting a hundred pounds, operating a jackhammer, moving tree limbs, that those couldn't possibly have been essential functions of his job because he worked the job for five years and never performed any of those functions. Nonetheless, the court found that the potential for these functions existed and that it's difficult to describe exactly what those employees were going to encounter on those rural roads in Douglas County. The same situation is here. Union Pacific doesn't know when they're going to need an employee to cover the overtime because CCD is late or can't be there. But there's no potential that if somebody calls in sick, they have to have someone in that seat to cover that critical call coming in. Well, let me ask you about something that concerns me about this case, and that's Union Pacific's engagement in the interactive process. It seems like Union Pacific's position is, you tell me what the restrictions are, we say no. And then you tell us, well, maybe we'll redo the restrictions. We say no. We can't accommodate. Isn't there some obligation to sit down and say, well, maybe we could do six weeks, maybe we could do eight weeks, if you can get the doctor to agree with this. It doesn't seem to me there's any back-and-forth on these restrictions. And secondly, on the interactive process, I think everybody would agree, I hope so, that one accommodation is a different job. Ms. McNeil clearly wanted a different job. And does Union Pacific discharge its interactive responsibility by just making sure that it's available? It does not. So, with respect to the restrictions on the overtime restrictions, number one, if this is an essential function, and Ms. McNeil could not show that they could have accommodated her in the CCD position. We don't know what the essential function is. It was four hours to start with, now it's two hours. Maybe it's an hour. I mean, isn't that what the interactive process is about? To say, well, we say four hours, but we can live with two? Well, her doctor's restrictions said no overtime. And the case law is clear that the employer is allowed to rely on those doctor's restrictions. And in fact, in the record, FFD nurse Jennifer Roberts explained why. They can't just take the employee's word for it. They have to rely on that doctor's information. She said, we have lots of employees who come in and say, well, I know my doctor's note says this, but my restrictions are really this. They have to be able to rely on those doctor's restrictions. And in this case, it's clear that Ms. McNeil understood that she thought her restrictions were through January, and Union Pacific understood them to be indefinite. And there's a phone call, a transcript of a phone call in the record, between her and Mr. Weiss, who's an EAP Union Pacific employee, where she And he says, you've got to follow up. You've got to submit a doctor's note that makes it clear that if your restrictions end in January, that's what your doctor says, too. And she says, okay, and gotcha. And then she never does that. And in the Russell versus TG Missouri court case, it's very similar, where there was a letter submitted that said the employee could only work eight hours per day, and if I can, I'm almost out of town, if I can continue and answer your question. In that case, the employee said, yeah, but that also meant I couldn't work over 40 hours in a week. And the employer said, well, that's not what the letter said. The court found that because the employee believed that the employer knew her restrictions to be different than from what she thought, it was incumbent upon her to correct that misunderstanding by the employer. But Ms. McNeil never did that. She never submitted anything from her doctor clarifying that restriction. Did you want to answer the question about whether offering the toll-free number is sufficient interaction regarding a different job? Thank you, Your Honor. Yes, I would. Since your time has expired. Absolutely. So they offered this 1-800 number, which she never called. They said, we'll provide you assistance in finding another job. She never called that. They also made job postings available to her that were not normally made for employees who are on late duty, and she applied for two of those jobs. Now, she wasn't qualified for those jobs, but she applied, and so it shows that that part of the interactive process that you and Pacific provided was effective. And then at the end of her long-term disability, they contacted her again and said, your disability has expired. If you want to come back, give us a doctor's note showing that you can meet the essential functions of the job, and she never did. So we would ask that the district court's opinion be upheld. Thank you. Mr. Brown, we'll hear from you in rebuttal. Thank you, Judge. Whether or not Mrs. McNeil's restriction was temporary or permanent, like the district court acknowledged, is a genuine issue material fact. And viewing the light and most favorable to the non-moving party, we're summary judgment. There was a lot of discussion about what is the essential function. Is it four hours? Is it two hours? I would also remind the court that the comparators, Darcy Brinson a third overtime, Justin Larson could work an occasional 12-hour shift. If the district court's opinion that the essential function is to be available for red days, which the comparators can't meet that essential function either. If you can only be available occasionally, now you're looking at it and saying, well, you have to be available four times per month. If Mr. Larson is called to work overtime every time, all four red days, he could very easily turn around and say, well, I've already met my occasional overtime and I'm not going to work anymore, which would put UP back in a situation where they're scrambling to a material fact. If there was this recorded phone call where the company and the employee discussed the supposed ambiguity and the employee was directed to get supplemental documentation and didn't do it, why doesn't that resolve it? Why doesn't that establish what the restriction was? Nurse Roberts, who is the UP nurse, testified that there was ambiguity as to whether this was, there was confusion actually was the word she used, as whether this was temporary or permanent. I know, but don't the cases say what counsel suggested that the employee needs to come forward with additional documentation to clear that? Absolutely, and in looking at what the comparators did and what UP did with the comparators is significant. It's something I think a jury would place a lot of weight upon and earlier I referenced Joint Appendix 1272 and that's the letter from Jennifer Roberts that indicates first shift work only, the above restrictions are considered permanent. The next day is a fax to the doctor from Jennifer, from Jennifer Roberts, from Nurse Roberts making further inquiry. Is first shift work only specific only to the time of scheduled work or work restricted in any way? Does first shift work only impact scheduling of rest days? Does first shift work only negate supervisor schedule or request to begin work early or late? UP took the initiative there in that case, but not with Mrs. McNeil. Why? That's a question I think that goes to Judge Malloy's question earlier is if you have the employer doing something with other employees and trying to determine whether or not they're able to meet an essential function and frankly we're not even, I don't think we've even established that it is an essential function, but if it is and we're trying to ascertain whether or not they can do with accommodation, I think you should be able to look and see how they've accommodated other employees and apply it to whether or not they did that with Mrs. McNeil and if they didn't, I think that's evidence that goes towards discrimination and that's what we're asking a jury to weigh and find here and your honors I am out of time. You are. Thank you for your argument. Thank you. Thank you to both counsel. The case is submitted and the court will hear the arguments this morning.